IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL ACTION NO. |
| v. | ) | 2:08-cr-149-WKW |
| | ) | [wo] |
| PETER MAKUSI OTEMBA OWUOR | ) | |

## **REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

Pending before the Court are Defendant's *Motion to Suppress Evidence* (Doc. 29, filed 9/24/08), Defendant's *Motion to Dismiss Indictment Due to Outrageous Government Conduct* (Doc. 30, filed 9/24/08), and the Government's *Responses to Defendant's Motion to Suppress and Motion to Dismiss* (Doc. 36, filed 10/15/08). Peter Makusi Otemba Owuor (hereinafter "Owuor" or "Defendant") seeks to exclude the statements he made to Immigration and Customs Enforcement ("ICE") Agents on May 23, 2008 because (1) the agents lacked reasonable suspicion to conduct a stop under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed. 889 (1968), (2) the agents violated his *Miranda* rights, and (3) his statements were not knowing and voluntary. *See* Doc. 29 generally. Owuor further asserts the ICE agents engaged in outrageous conduct by applying extreme and excessive force resulting in injuries to Owuor and as a result, the indictment should be dismissed. *See* Doc. 30 generally. An evidentiary hearing was conducted on December 15, 2008. After the evidentiary hearing and due consideration of briefs, arguments, exhibits, and applicable law, the Magistrate Judge recommends that the District Court **DENY** the motion to suppress and

the motion to dismiss the indictment.

## I. FACTUAL BACKGROUND, MOTION TO SUPPRESS, AND MOTION TO DISMISS

On July 15, 2008, the United States filed a criminal complaint against Owuor for falsely representing himself to be a citizen of the United States. *See* Doc. 1. Owuor was arrested on July 16, 2008. On July 29, 2008, the Grand Jury for the Middle District of Alabama indicted Owuor for making fraudulent statements and falsely representing himself to be a citizen of the United States. *See* Doc. 23.

On September 24, 2008, Owuor filed his motion to suppress and the motion to dismiss the indictment. *See* Docs. 29-30. The Motion to Suppress seeks to suppress any alleged statements provided by Owuor on May 23, 2008. *See* Doc. 29 at p. 1 and 7. Specifically, Owuor asserts three reasons to suppress the alleged statements. First, Owuor contends the ICE agents did not have reasonable suspicion to initiate the questioning of Owuor and thus violated the principles of *Terry*. Doc. 29 at p. 3-5. Second, Owuor avers the ICE agents did not administer the *Miranda* warning prior to interrogation. *Id*. at p. 5-6. Finally, Owuor asserts the alleged statements were not voluntary and were the result of force and coercion. *Id*. at p. 6-7.

The United States filed its response on October 15, 2008 wherein it asserts Owuor was in state custody on unrelated charges and Owuor initiated contact with the ICE agents. *See* Doc. 36 at p. 10. Consequently, the government asserts *Terry* is inapplicable to the situation with Owuor. *Id*. Next, the United States asserts Owuor's voluntary comments unresponsive

to government questioning are admissible against a criminal defendant. *Id*. Additionally, statements made to ICE agents attempting to determine immigration status are likewise admissible. *Id*. Finally, the United States disputes the allegations of outrageous conduct by the ICE agents. *Id*. at 10-11.

The court conducted a hearing on December 15, 2008 and heard the testimony of Senior Special Agent David Henderson ("SSA Henderson"), Senior Special Agent Blake Diamond ("SSA Diamond"), Assistant Warden Mary Brantley ("Assistant Warden Brantley"), Second Shift Supervisor Steven Smith ("Supervisor Smith"), Officer Phoukham Sichanthavong ("Officer C"),[1] and Willie Robinson ("Robinson").

On May 23, 2008, SSA Henderson and SSA Diamond - both ICE agents - went to the Montgomery, Alabama Municipal Jail to book for detention two ICE detainees for administrative violations.[2] *See* Doc. 46, Transcript ("Tr."); Tr. 9 lines 9-15, Tr. 64 lines 10-17. At the same time, Owuor was at the Municipal Jail in the custody of Officer C, a City of Montgomery Police Officer. Tr. 156 lines 2-25. Owuor was in custody because of at least one outstanding warrant. Tr. 17 lines 18-22.

SSA Henderson and Officer C were classmates at the Montgomery Police Academy. The two struck up a casual conversation as they waited their respective turns to book their

---

[1] During the hearing most of the witnesses referred to Officer Phoukham Sichanthavong as "Officer C." He also testified that it is appropriate to call him by that nickname. Because of the complexity of his last name and the fact the witness was not offended by the name, the Court elects to use his nickname in this opinion.

[2] The two ICE detainees themselves are unrelated to this matter.

prisoners.  Tr. 14 line 5 - Tr. 16 line 7; *see also* Tr. 158 lines 17-25 (testimony by Officer C). At some point, SSA Henderson and SSA Diamond heard Officer C talk to Owuor and noticed Owuor had a strong African accent.  Tr. 16 lines 10-12.

SSA Henderson and SSA Diamond both testified that while standing in line at the Municipal Jail, Owuor turned to them and asked them if they were immigration agents.  Tr. 16 lines 11-21; Tr. 65 line 25 - Tr. 66, line 1 and lines 14-15.  SSA Henderson and SSA Diamond testified they asked Owuor where he was from to which Owuor responded he was born in Atlanta, Georgia.  Tr. 16 lines 21-24; Tr. 66 lines 16-21.  When asked about his accent Owuor stated it was because he traveled extensively.  Tr. 16 line 25 - Tr. 17 line 17; Tr. 66 lines 23-25.

SSA Henderson testified he asked Officer C for a copy of Owuor's arrest report and Officer C made him a copy.  Tr. 17 lines 11-13; Tr. 67 lines 4-5; *see also* Tr. 161 lines 15-18 (testimony by Officer C).  SSA Henderson and SSA Diamond testified that SSA Henderson noticed the Social Security number area was blank so he asked Owuor for his Social Security Number.  Tr. 17 lines 13-17; Tr. 67 lines 7-12.  Owuor gave him the number and SSA Henderson wrote down the information.  *Id*.  Officer C completed booking Owuor into the jail and SSA Henderson and SSA Diamond booked their detainees and left the Municipal Jail.  Tr. 18 lines 1-3; Tr. 67 lines 19-25.  Upon their return to the office, SSA Henderson contacted the Social Security Administration to verify the Social Security Number provided by Owuor while Agent Diamond ran a criminal history report on Owuor.  Tr. 18 lines 5-13;

Tr. 68 lines 7-12. The Social Security administration told SSA Henderson the Social Security Number Owuor gave him was not assigned to Owuor and the criminal history report showed Owuor was born in Kenya. *Id*. SSA Henderson and SSA Diamond went back to the jail to confirm the social security number provided and to interview Owuor. Tr. 18 lines 15-19; Tr. 68 lines 7-24.

SSA Henderson and SSA Diamond testified they met with Owuor in an interview room at the Municipal Jail. Tr. 19 lines 1-5; Tr. 69 line 25 - Tr. 70 line 11. Owuor was handcuffed. Tr. 69 lines 24-25; Doc. 29 a p. 2  Owuor continued to insist he was a United States citizen. Tr. 18 lines 19-20; Tr. 70 line 13 - Tr. 71 line 8. Owuor eventually said his father was from Kenya, but his mother was American. Tr. 19 lines 13-17; Tr. 70 lines 18-20. Owuor also told SSA Henderson and SSA Diamond he traveled using a United States passport, but that it was in a different name. Tr. 19 lines 19-21; Tr. 70 line 21 - Tr. 71 line 17. The admission prompted SSA Diamond to give Owuor a *Miranda* warning. Tr. 19 lines 21-23; Tr. 71 lines 17-20.

After the *Miranda* warning, Owuor refused to answer further questions. Tr. 20 lines 1-4; Tr. 72 lines 15-18. Jail officials needed the interview room for some other purpose, therefore the ICE agents escorted Owuor to the main part of the jail so they could take his fingerprints. Tr. 20 lines 2-6; Tr. 72 line 18 - Tr. 73 line 7. The Municipal Jail uses a scanner to obtain fingerprints. Tr. 53 lines 21-22; Tr. 73 lines 3-4. SSA Diamond testified they carry an ink fingerprint pad with them so they can get the type and quality prints they

need for their ICE equipment.  Tr. 53 line 21 - Tr. 54 line 3; Tr. 73 line 4 - Tr. 74 line 4. After removing the handcuffs, SSA Henderson and SSA Diamond testified that while they attempted to take Owuor's fingerprints he began resisting, struggling, and eventually backed into a nearby wall which resulted in an arm bar takedown to subdue him.  Tr. 49 line 23 - Tr. 50 line 1; Tr. 58 lines 6-23; Tr. 75 line 6 - Tr. 76 line 4.  Five or six other officers came to assist in subduing and handcuffing Owuor.  Tr. 59 lines 11-20; Tr. 76 lines 4-7.  According to SSA Diamond and SSA Henderson, after the takedown, Owuor yelled about his arm and continued to yell about it afterwards.  Tr. 59 line 25 - Tr. 60 line 1; Tr. 76 lines 10-11.  SSA Henderson and SSA Diamond then left the Municipal Jail and had no further contact with Owuor.  Tr. 60 lines 3-6; Tr. 76 lines 11-15.

Assistant Warden Mary Brantley testified at the hearing.  Tr. 109 - Tr. 140.  Assistant Warden Brantley initially testified as to the layout of the jail.  Tr. 110-118.  She also testified she was familiar with Owuor from his time at the facility and knew he wore a shoulder harness at some point after his encounter with the ICE agents.  Tr. 118 line 16 - Tr. 119 line 9.  Assistant Warden Brantley did not remember Owuor having a bandage on his finger.  Tr. 119 lines 10-16.  She further testified about the video system in the Municipal Jail and identified as many persons in the videotape of the incident as she could.  Tr. 119 -141.

Second Shift Supervisor Steven Smith also testified at the hearing.  Tr. 142 - Tr. 154. Supervisor Smith testified he heard Owuor yell in the hallway and went to investigate.  Tr. 143 lines 9-19.  He further testified Owuor complained about pain in his finger and his

shoulder sometime after the incident. Tr. 143 line 20 - Tr. 144 line 19. Owuor was later taken to see the jail nurse after his encounter with the ICE agents and the next day was wearing a shoulder harness and finger bandage. Tr. 145 lines 7-19. Supervisor Smith finally testified he did not witness any excessive force applied to Owuor, but only the force necessary to bring him into compliance. Tr. 150 lines 12-23.

Next, Willie Robinson - an inmate of the Municipal Jail on May 23, 2008 - testified as to his knowledge of the incident at issue. Tr. 163 - Tr. 192. Robinson testified he was in the medical holding cell which is adjacent to the table where SSA Henderson and SSA Diamond took Owuor. Tr. 163 line 24 - Tr. 165 line 23. Robinson testified he heard the ICE agents question Owuor in an aggressive tone about his country of origin. Tr. 170 lines 18-25; Tr. 190 lines 1-5. Robinson further testified Owuor screamed the ICE agents were breaking his finger and then witnessed the takedown. Tr. 170 lines 1-13; Tr. 189 lines 22-25. Robinson stated the videotape of the incident was consistent with what he saw. Tr. 175 line 24 - Tr. 176 line 1. He also stated he did not see anyone kick, spit on, or use a baton on Owuor. Tr. 190 lines 14-21.

Finally, throughout the hearing a number of exhibits were introduced including photographs of the Municipal Jail, drawings of the facility, medical records and most importantly, a video clip of the incident at issue (relating to the claim of excessive force). *See* Exhibits generally. The Government submitted medical documents which show Owuor was taken to Jackson Hospital & Clinic where he had his hand and shoulder examined. *See*

Government Exhibit 2. Dr. Bobby Brown saw no abnormalities in the shoulder or hand. *Id*. Defendant submitted medical records from Advanced Orthopedic Specialists, P.C. *See* Defendant's Exhibit 20. On June 2, 2008, Dr. W.L. Pinchback, Jr. examined the x-rays from Jackson Hospital and also concluded there was no evidence of abnormality with the hand or shoulder. *Id*. He diagnosed Owuor with having a ruptured extensor tendon in his finger and a sprained shoulder. *Id*. Dr. Pinchback prescribed the shoulder harness and finger bandage.[3] *Id*. On June 6, 2008, Dr. Pinchback did a "closed treatment of extensor tendon insertion with percutaneous pinning. *Id*. An examination on June 27, 2008 showed Owuor was "doing very well." *Id*.

## II. DISCUSSION AND ANALYSIS

The Court will first address the issues that relate solely to the motion to suppress - i.e. alleged violations of *Terry* and *Miranda*. The Court will then look to the alleged misconduct by the ICE agents as it pertains to the motion to suppress and the motion to dismiss.

### A. Whether there was a violation of law pursuant to *Terry v. Ohio*

The Fourth Amendment guarantees: "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things

---

[3] The Court does not need to make a factual determination regarding whether Owuor suffered injuries, but rather, whether the alleged injuries resulted from excessive force - the analysis of which will be in Section II(C).

to be seized." U.S. CONST. AMEND. IV.  Warrantless searches and seizures are per se unreasonable unless an exception applies. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967) (citations omitted).  One such exception is delineated in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, and is commonly referred to as a *Terry* stop.  It provides that "[l]aw enforcement officers may briefly detain a person for an investigatory stop if they have a reasonable, articulable suspicion based on objective facts that the person has engaged, or is about to engage, in criminal activity." *United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1220 (11th Cir. 1993) (citing *Terry*, 392 U.S. 1, 88 S.Ct. 1868).  To justify this intrusion, the reasonableness standard requires that the office "be able to point to specific and articulable facts, which, when taken together with rational inferences from those facts, reasonably warrant that intrusion." *United States v. Mikell*, 102 F.3d 470, 474-75 (11th Cir. 1996) (quoting *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880); *see also United States v. Powell*, 222 F.3d 913, 917 (11th Cir. 2000) (officer must have "a reasonable, articulable suspicion based on objective facts that the person has engaged in, or is about to engage in, criminal activity.").  "The officer must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity." *Illinois v. Wardlow*, 528 U.S. 119, 123-24, 120 S.Ct. 673, 676, 145 L.Ed.2d 570 (2000) (quoting *Terry*, 392 U.S. at 27, 88 S.Ct. 1868) (internal quotations omitted); *accord Powell*, 222 F.3d at 917 (same).  Moreover, "[w]hile 'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth

Amendment requires at least a minimal level of objective justification for making the stop." *Wardlow*, 528 U.S. at 123, 120 S.Ct. at 675-76 (citing *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989)); *accord Diaz-Lizaraza*, 981 F.2d at 1220-21. It may even be based on "commonsense judgment and inferences about human behavior." *Wardlow*, 528 U.S. at 125, 120 S.Ct. at 676; *Powell*, 222 F.3d at 917 (quoting *Wardlow*). Finally, the court must look to the "totality of the circumstances." *United States v. Arvizu*, 534 U.S. 266, 274, 122 S.Ct. 744, 751, 151 L.Ed.2d 740 (2002).

ICE agents are authorized "to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States." 8 U.S.C. § 1357; *see also United States v. Rodriguez-Franco*, 749 F.2d 1555, 1559 (11th Cir. 1985) (citing statute as it refers to INS agents - the former reference for ICE agents). "This authority is not unbounded, but is subject to the principles of the fourth amendment as it relates to searches and seizure. Thus, the INS is forbidden from detaining persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens." *Rodriguez-Franco*, 749 F.2d at 1559 (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975)). A request for identification does not, by itself, amount to a detention protected by the Fourth Amendment "unless the circumstances of the encounter were so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded." *Id*. (quoting *INS v. Delgado*, 466 U.S. 210, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984)) (internal modifications omitted).

Owuor was at the Municipal Jail in the custody of Officer C pursuant to a valid warrant. Neither SSA Henderson nor SSA Diamond took custody of Owuor at this time.[4] The ICE agents both testified - and the Court finds the testimony credible - that Owuor approached them and asked them if they were immigration agents. Tr. 16 lines 11-21; Tr. 65 line 25 - Tr. 66, line 1 and lines 14-15. During casual conversation, Owuor volunteered his alleged United States citizenship and said his accent was from extensive travel. Tr. 16 - Tr. 17; Tr. 66 lines 16-25. After viewing the arrest report, SSA Henderson saw the Social Security number was blank and asked Owuor for his social security number and Owuor provided a number.[5] At this point, Owuor went with Officer C to complete booking and the conversation ended. Tr. 18 lines 1-3; Tr. 67 lines 19-25.

The Court concludes the initial contact with Owuor including the conversation concerning citizenship was authorized under 8 U.S.C. § 1357 and was no more than a police-citizen encounter not involving the Fourth Amendment. *See Rodriguez-Franco*, 749 F.2d at 1560. As such, *Terry* is inapplicable and the evidence admissible.

**B.     Whether the ICE agents violated Defendant's *Miranda* rights**

It has long been held that "the prosecution may not use statements, whether

---

[4]     With regard to the custody of Owuor. The Court concludes SSA Henderson and SSA Diamond took custody of Owuor at the point when they issued the *Miranda* warning.

[5]     After contacting the Social Security Administration, the ICE agents initially determined the number provided was not a match and went back to the Municipal Jail to question Owuor to ensure it was not an error. Tr. 18 lines 5-13; Tr. 68 lines 7-12. It was later revealed the last two numbers were reversed. Tr. 89 line 21 - Tr. 90 line 8.

exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966 ). Commonly known as a *Miranda* warning, prior to interrogation a defendant must be given a warning about his constitutional rights. Whether the *Miranda* warning is warranted is contingent upon whether the defendant was subject to interrogation while "in custody" and is "a mixed question of law and fact." *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996). However, "the mere fact of imprisonment does not mean that all of a prisoner's conversations are official interrogations that must be preceded by Miranda warnings." *United States v. Willoughby*, 860 F.2d 15, 23 (2d Cir. 1988). For the purposes of Miranda, the interrogation "must reflect a measure of compulsion above and beyond that inherent in custody itself." *Rhode Island v. Innis*, 446 U.S. 291, 300, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980).

Applying the law to the situation here, Defendant was in the custody of Officer C and not the ICE agents. When an individual has been detained on charges unrelated to his immigration status, a request for identification does not amount to information protected by the Fourth Amendment. *See, e.g., United States v. Gonzalez*, 2008 WL 928087 (S.D. Ga. 2008) (unpublished) (citing and quoting *United States v. Rodriguez*, 356 F.3d 254, 258 (2d Cir. 2004) ("At the time of the interview [regarding his immigration status], the defendant had not yet committed an offense to which his citizenship or nationality would be

relevant.")). Here, the Court concludes the discussion between Owuor and the ICE agents was not the nature of an interrogation. Rather, they were simply questioning Owuor's citizenship status and voluntary statements made by Owuor were not subject to the customary *Miranda* warnings. *See United States v. Ricardo*, 619 F.2d 1124, 1130-31 (5th Cir. 1980); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981)(*en banc*) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

Finally, the Court has already found the testimony of SSA Henderson and SSA Diamond credible as to how the conversation between Owuor and the ICE agents began. Owuor initiated the conversation with the ICE agents and gave his own statements about his alleged United States' citizenship, therefore the statements are admissible. "Voluntary comments unresponsive to governmental questioning are admissible." *United States v. Suggs*, 755 F.2d 1538, 1542 (11th Cir. 1985); *see also Cannady v. Dugger*, 931 F.2d 752, 754 (11th Cir. 1991) ("Voluntary and spontaneous comments by an accused . . . are admissible evidence if the comments were not made in response to government questioning."). Consequently, Owuor's motion for suppression on this basis is due denial.

### C. Whether the ICE agents' conduct was so shocking and outrageous to justify suppression or dismissal

Lastly, in both his motion to dismiss and the motion to suppress, Owuor seeks either dismissal of the indictment or suppression of the evidence by asserting Owuor's statements were the product of police force and coercion. *See* Doc. 29 at p. 6; Doc. 30 generally.

Specifically, Owuor states SSA Henderson and SSA Diamond (1) tortured Owuor, (2) broke Owuor's finger, (3) dislocated Owuor's shoulder, and (4) tore Owuor's shoulder muscle. Doc. 30 at p. 1.

If law enforcement agents engage in conduct so outrageous and shocking that it violates the fundamental principles of due process, the government may be barred from invoking judicial processes to obtain a conviction. *See United States v. Russell*, 411 U.S. 423, 431-32, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973); *United States v. Edenfield*, 995 F.2d 197, 200 (11th Cir. 1993). In reviewing the testimony of all the witnesses and viewing the video clip of the incident, the Court cannot find that the ICE agents conduct reaches the level necessary to warrant suppression or dismissal. *See* Exhibit 19, Video. Though Robinson testified he thought the officers used excessive force, nothing he said truly contradicts the testimony of SSA Henderson, SSA Diamond, Assistant Warden Brantley, or Supervisor Stevens. Robinson testified he saw Owuor "slammed on the floor." Tr. 170 line 13. The ICE agents admit to an arm bar takedown of Owuor. Robinson further stated the videotape of the incident was consistent with what he saw. Tr. 175 line 24 - Tr. 176 line 1. The Court has viewed the video clip (Defendant's Exhibit 19) and sees no conduct, outrageous or otherwise, which warrants dismissal of the indictment or suppression of the evidence. Rather the conduct is consistent with the testimony of all parties including Supervisor Smith who said he did not witness any excessive force being applied to Owuor, but only the force necessary to bring him into compliance. Tr. 150 lines 12-23. Thus, the

Court concludes the officers used no more force necessary than to subdue Owuor. As a result, the motion to dismiss and request for suppression are due to be denied.

### III.  CONCLUSION

Pursuant to the foregoing findings and conclusions, it is the **RECOMMENDATION** of the Magistrate Judge that Defendant's *Motion to Suppress Evidence* (Doc. 29) and Defendant's *Motion to Dismiss Indictment Due to Outrageous Government Conduct* (Doc. 30), be **DENIED**.

It is further **ORDERED** that the parties shall file any objections to the said Recommendation not later than **January 29, 2009.** Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); *see Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en*

*banc*) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

DONE this 16th day of January, 2009.

> /s/ Terry F. Moorer
> TERRY F. MOORER
> UNITED STATES MAGISTRATE JUDGE