IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

UNITED STATES OF AMERICA     )
    )
v.     )      CASE NO. 2:08-CR-149-WKW [WO]
    )
PETER MAKUSI OTEMBA OWUOR     )

## MEMORANDUM OPINION AND ORDER

On January 16, 2009, the Magistrate Judge entered a report and recommendation ("Recommendation") that both the motion to suppress (Doc. # 29) and the motion to dismiss the Indictment (Doc. # 30), filed by Defendant Peter Makusi Otemba Owuor ("Owuor"), be denied. (Recommendation 1-2 (Doc. # 47).) Mr. Owuor filed objections to the Recommendation and requested a rehearing of the evidence. (Def.'s Objections (Doc. # 48).) Mr. Owuor also filed supplemental points and authority in support of his motion to dismiss and his objections. (Doc. # 54.) The portions of a recommendation to which a defendant objects are reviewed *de novo*. 28 U.S.C. § 636(b)(1).

Mr. Owuor contends as a preliminary matter that a supplemental evidentiary hearing is necessary because the Recommendation relies upon credibility determinations to reach its outcome. (Def.'s Objections 1.) Because the credibility determinations are not dispositive to this court's ruling on the motion to suppress, however, and because resolution of the motion to dismiss is adequately justified by an independent review of the videotape, a supplemental hearing will not be necessary.

The Recommendation's conclusion is that the court deny both pending motions. The Recommendation finds there was no violation of Mr. Owuor's Fourth Amendment right to

be free from unreasonable searches and seizures (Recommendation 11), no violation of Mr.

Owuor's *Miranda* rights under the Fifth Amendment (Recommendation 13), and no violation

of due process for outrageous conduct (Recommendation 14-15). The Recommendation's

findings are due to be adopted, with supplemental reasoning to fairly address the objections.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

On May 23, 2008, Mr. Owuor was at the municipal jail in Montgomery, Alabama, to

be booked on outstanding state warrants.[1]  He was waiting to be booked in the holding area

where two Immigration and Customs Enforcement ("ICE") Agents, Senior Special Agent

David Henderson ("Agent Henderson") and Senior Special Agent Blake Diamond ("Agent

Diamond") (collectively, the "Agents"), were waiting to book other arrestees unrelated to this

case.  The Agents overheard Mr. Owuor speaking to an officer and noticed Mr. Owuor's

strong African accent.  At some point, the Agents and Mr. Owuor entered into a

conversation.[2]  During that conversation, the Agents asked Mr. Owuor where he was from.

The Recommendation credits the Agents' testimony that he responded that he was born in

---

[1] The Recommendation presents an accurate narration of the facts.  This section will summarize those facts, carefully distinguishing conclusions requiring credibility determinations. The Recommendation provides the record citations, so the record will be cited in this opinion only when necessary to highlight a point.

[2] The Recommendation finds that Mr. Owuor initiated the conversation.  Both of the Agents testified that Mr. Owuor was present during their conversation with Mr. Owuor's arresting officer, whom one of the Agents knew, and that Mr. Owuor observed the two individuals the Agents were booking before he initiated the conversation.  Mr. Owuor argues instead that the Agents asked him without prompting for citizenship information and that after he answered, he expressed not wanting to speak to them.  (Def.'s Mot. Suppress 1-2.)  He argues that he would not have volunteered citizenship information to the Agents, and that this reticence is evidenced by eyewitness testimony of his refusal to share information with them later.  (Def.'s Objections # 3.)  Whether Mr. Owuor or the Agents initiated the conversation, however, is not dispositive of the Fourth Amendment claim.  In addition, Mr. Owuor did not testify to any of these allegations.

Atlanta, Georgia, and when asked about his accent, stated that he traveled extensively (Recommendation 4). (Def.'s Objections #2 & 3.) Agent Henderson asked for Mr. Owuor's arrest report from the arresting officer and noticed that it lacked a social security number. Agent Henderson asked Mr. Owuor for that number, which he gave.

After leaving the jail, the Agents contacted the Social Security Administration to verify the social security number Mr. Owuor gave them and ran a criminal report. The Social Security Administration reported that the social security number did not match with Mr. Owuor, and the criminal history report showed that Mr. Owuor was born in Kenya. The Agents returned to the jail ostensibly "to confirm the Social Security number which Mr. Owuor had provided" (Evidentiary Hr'g Tr. 18, Dec. 15, 2008 (Doc. #46)) and to confirm his place of birth (Hr'g Tr. 69). They interviewed Mr. Owuor, who was handcuffed, in a separate room and away from the rest of the jail population. Mr. Owuor was alone with them in the interview room. They continued to ask him questions about his citizenship, to which Mr. Owuor responded with allegedly false information about his citizenship. Not until after Mr. Owuor had made those statements, however, did the Agents issue Mr. Owuor his *Miranda* warnings. Mr. Owuor refused to answer questions after the warnings.[3]

The Agents and Mr. Owuor left the interview room to make it available for other parties, and at some point, the Agents took Mr. Owuor to the end of the hall. The Agents testified that they were attempting to take Mr. Owuor's fingerprints with an ink pad when he

---

[3] Agent Henderson testified that the *Miranda* warnings were given after Mr. Owuor made claims of multiple citizenship (Hr'g Tr. 45), while Agent Diamond testified that they were given later, after Mr. Owuor admitted to traveling under a passport with a different name (Hr'g Tr. 71).

resisted and started to act in an aggressive manner, and they applied force to control his aggression.  The incident was captured on videotape.  No one else was in the hallway at that point except prisoners in a cell facing the hallway.  One of those prisoners, Willie Robinson ("Robinson"), testified at the evidentiary hearing in support of Mr. Owuor.  Mr. Robinson provided additional details of the altercation supporting Mr. Owuor's claims but also noted that the videotape was consistent with what he witnessed.[4]  (Hr'g Tr. 175-76.)  The Agents eventually took Mr. Owuor down to the floor.  At that point, other officers poured into the hallway to assist.  Mr. Owuor was indicted on July 29, 2008, for falsely and willfully misrepresenting himself as a United States citizen in violation of 18 U.S.C. § 911, and for knowingly and willfully making a false, fictitious, and fraudulent statement and representation in violation of 28 U.S.C. § 1001(a)(2).

## II.  FOURTH AMENDMENT CLAIM

Mr. Owuor moved to suppress statements he made to Agents on the basis that the Agents violated his Fourth Amendment right to be free from unreasonable seizures.  (Def.'s Mot. Suppress 1 n.1, 3-5.)  Mr. Owuor argues that the police did not have the requisite suspicion to detain him during the initial encounter in the booking room and to ask him questions related to his citizenship.  (Def.'s Mot. Suppress 4.)

ICE agents may interrogate any person "believed to be an alien as to his right to be or to remain in the United States," 8 U.S.C. § 1357(a)(1), but that authority "is not

---

[4] The videotape did not include sound, however, and thus, cannot confirm or discredit Mr. Robinson's audio observations – that the Agents were asking Mr. Owuor where he was from, and that Mr. Owuor was crying out in pain.  (Hr'g Tr. 173-75.)

4

unbounded," and the Fourth Amendment governs those encounters, *United States v. Rodriguez-Franco*, 749 F.2d 1555, 1559 (11th Cir. 1985).   The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."   U.S. Const. amend. IV.   If a seizure is unreasonable, "evidence obtained as a direct result" of that seizure, and evidence "later discovered and found to be derivative of an illegality or fruit of the poisonous tree," must be excluded.   *Segura v. United States*, 468 U.S. 796, 804 (1984).

For a seizure to be reasonable, it must be justified by probable cause of a suspect's criminal activity, *see, e.g.*, *Case v. Eslinger*, 555 F.3d 1317, 1326 (11th Cir. 2009), but if the seizure is only a "brief investigatory stop," its justification may be based on suspicion short of probable cause, *Terry v. Ohio*, 392 U.S. 1 (1968); *e.g.*, *United States v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008) (per curiam).   The quantum of justification required for a brief investigatory stop is a "'reasonable, articulable suspicion based on objective facts that' an individual is engaged in criminal activity."   *Id.* (quoting *United States v. Powell*, 222 F.3d 913, 917 (11th Cir. 2000)); *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).

For Fourth Amendment rights to even be triggered, however, the suspect must be "seized" for purposes of the Amendment.   "[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions.   So long as a reasonable person would feel free 'to disregard the police and go about this business,' the encounter is consensual and no reasonable suspicion is required."   *Florida v. Bostick*, 501 U.S. 429, 434 (1991) (citation omitted); *accord United States v. Drayton*, 536 U.S. 194, 201 (2002) ("If a

5

reasonable person would feel free to terminate the encounter, then he or she has not been seized."); *see also I.N.S. v. Delgado*, 466 U.S. 210, 216 (1984) (applying similar test to immigration enforcement questioning, though before *Bostick*).

In *Muehler v. Mena*, 544 U.S. 93 (2005), the Supreme Court reiterated that "'mere police questioning does not constitute a seizure.'" *Id.* at 101 (quoting *Bostick*, 501 U.S. at 434). Mena sued law enforcement officers for their execution of a search warrant for an unrelated crime. *Id.* at 96. During the search, the officers detained Mena and other occupants of the premises in a garage, where they were handcuffed and guarded by officers. *Id.* During that detention, Immigration and Naturalization Service ("INS") officers were called to the scene because of suspicions that the involved gang members were illegal immigrants. *Id.* The INS officers questioned those detained in the garage and asked for each detainee's name, date and place of birth, and immigration status. *Id.*

The Court held that Mena's Fourth Amendment rights were not violated when the INS Agents asked her about her biographical information and immigration status during her detention. *Id.* at 101. Citing *Bostick* and *Delgado*, the Court noted that mere police questioning does not amount to a seizure, and that the officers did not need a reasonable suspicion to question Mena about her name, date and place of birth, and immigration status. *Id.* Because the original detention was lawful and because the appellate court had not found

that the additional questioning extended the detention, "no additional Fourth Amendment justification for inquiring about Mena's immigration status was required." *Id.*[5]

The detention and questioning in *Muehler* are analogous to what occurred in this case, and when the Agents asked Mr. Owuor questions during his encounter in the interview room, he was not seized for Fourth Amendment purposes.  Mr. Owuor was lawfully detained for an unrelated crime, albeit in the jail, not in a garage, but, like Mena, detained and unable to freely exit.  The Agents only questioned him, however, about where he was from, and there is no evidence that their brief questioning prolonged or qualitatively affected the original detention.  The assumption that an "independent reasonable suspicion" is required to question a detained individual about his immigration status is "faulty."  *Muehler*, 544 U.S. at 100-01. The Agents' questioning in this case did not constitute an independent Fourth Amendment seizure, and thus, the Recommendation's conclusion on this claim is due to be adopted.[6]

---

[5] *See also United States v. Childs*, 277 F.3d 947, 949 (7th Cir. 2002) (*en banc*) ("The full court holds that, because questions are neither searches nor seizures, police need not demonstrate justification for each inquiry."); *id.* at 951 ("If the police may ask (without suspicion) questions of persons who are not in custody (e.g., walking down the street), people who are in practical but not legal custody (e.g., passengers on busses and airplanes), and people who are in formal custody pending trial or following conviction (e.g., prisoners such as Cobb, a pretrial detainee), then why would the police need probable cause or reasonable suspicion to direct questions to persons such as Childs who are in legal custody but likely to be released soon?").

[6] The Recommendation concludes that the initial contact with Mr. Owuor "was authorized by 8 U.S.C. § 1357 and was no more than a police-citizen encounter not involved the Fourth Amendment." (Recommendation 11.)  Because there was no seizure, Mr. Owuor was not in "custody."  His Fifth Amendment claim as to the statements in the booking room is therefore due to be rejected.

### III.  FIFTH AMENDMENT SELF-INCRIMINATION CLAIM

Mr. Owuor moved to suppress the statements he made to the Agents on the basis that the Agents violated *Miranda* requirements, and thus, his Fifth Amendment rights.  He argues that because the questioning in the interview room "was done in a custodial setting to verify information that had been obtained through police investigation, and the answers provided could be incriminating" (Def.'s Objections # 5), the Agents should have read him *Miranda* warnings earlier, when they started the questioning.  (*See* Def.'s Mot. Suppress 5-6.)  It is the Recommendation's conclusion, however, that the interview prior to when the Agents issued the warnings was not a custodial interrogation.  (Recommendation 13.)  The court agrees with the Recommendation but on different grounds.

"In *Miranda v. Arizona*, 384 U.S. 436, 444 [(1966)], the Supreme Court held that protecting a suspect's Fifth Amendment privilege against self-incrimination requires that he be warned prior to 'custodial interrogation' that he has the right to remain silent and to have an attorney present." *United States v. Lopez-Garcia*, — F.3d —, 2009 WL 1044594, at *7 (11th Cir. Apr. 21, 2009).  A failure to warn "creates a presumption of compulsion," such that unwarned statements in a custodial interrogation must be excluded.  *Oregon v. Elstad*, 470 U.S. 298, 307 (1985).  But because the *Miranda* rule "sweep[s] beyond" Fifth Amendment protection, "a blanket suppression rule" is not appropriate, and any extension of *Miranda* is only justified if it is necessary to protect the right against self-incrimination. *United States v. Patane*, 542 U.S. 630, 640 (2004) (plurality op.).  For that reason, the *Miranda* rule "'does not require that the statements [taken without complying with the rule]

8

and their fruits be discarded as *inherently* tainted." *Id.* (emphasis added) (quoting *Elstad*, 470 U.S. at 307).

"[A]s a general rule it can be said that no fifth amendment problem is presented when a statement is admitted into evidence which is not confessional in nature, but in and of itself constitutes the crime charged." *United States v. Kirk*, 528 F.2d 1057, 1062 (5th Cir. 1976).[7] This is because the Fifth Amendment prohibition against self-incrimination "relates to crimes alleged to have been committed *prior* to the time when the testimony is sought." *See id.* at 1061 (emphasis added) (citing Supreme Court case and earlier Fifth Circuit case). For the same reason, Fifth Amendment protections from unwarned custodial inculpatory statements do not license a defendant to testify falsely and commit perjury. *See id.* Tracking this logic, *Kirk* held that a defendant could not suppress statements he gave to Secret Service agents even if they were in violation of *Miranda* requirements because they constituted the basis of the charge against him – threatening to kill the President of the United States. *Id.* at 1061-62.[8]

_____

[7] In *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions handed down by the former Fifth Circuit prior to October 1, 1981.

[8] The Eleventh Circuit has held similarly for Fourth Amendment purposes that the police can arrest a defendant for a new crime even if the crime was committed in response to an illegal seizure. "A contrary rule would virtually immunize a defendant from prosecution for all crimes he might commit that have a sufficient causal connection to the police misconduct" and "gives a defendant an intolerable carte blanche to commit further criminal acts so long as they are sufficiently connected to the chain of causation started by the police misconduct." *United States v. Bailey*, 691 F.2d 1009, 1012-13, 1016-17 (11th Cir. 1982).

Relying on these arguments, the Fifth Circuit has since held, again, that the exclusionary rule does not extend to statements made during a custodial interrogation that themselves "constitute[] a new, distinct crime." *United States v. Garcia-Jordan*, 860 F.2d 159, 159 (5th Cir. 1988). In *Garcia-Jordan*, the defendant appealed from his conviction for falsely representing himself to be a United States citizen. *Id.* The court held that the statement he made to border patrol officials that he was a United States citizen could not be suppressed, *id.*:

> Committing a crime is far different from making an inculpatory statement, and the treatment we afford the two events differs accordingly. An inculpatory statement usually relates to a previously committed illegal act; there is nothing unlawful about the statement itself. A crime, on the other hand, whether committed by word or deed is by definition an act that violates the law. We exclude inculpatory evidence when it is obtained as a result of the unlawful search or seizure. We have never, however, applied the exclusionary rule as a bar to the prosecution of a crime.

*Id.* at 160. The court agreed with the Ninth Circuit that when a defendant claims "that the police have exploited an illegal arrest by creating a situation in which a given criminal response is predictable, . . . the better approach [than applying the exclusionary rule] would be to determine whether the government's prosecution of the crime would abridge fundamental protections against unfair treatment.'" *Id.* at 161 (alteration in original) (quoting *United States v. Mitchell*, 812 F.2d 1250, 1254 (9th Cir. 1987)); *see also Bailey*, 691 F.2d at 1018 n.9 (hinting at a similar notion when stating as to the issues not confronted in the opinion of the agents intentionally provoking a crime during an illegal detention, or agents generating a second crime as a pretext to legitimize an illegal detention, that the court "would

not tolerate that" and "was satisfied that courts [would] be alert to discern such abuses"). "'[E]xtending the exclusionary rule to bar prosecution of new crimes is simply unwarranted both from a historical and practical standpoint.'" *Id.* (quoting *Mitchell*, 812 F.2d at 1254).

The Fifth Circuit further elaborated on the limits of the exclusionary rule in this context and the standard for a residual claim under due process in a later opinion, *United States v. Smith*, 7 F.3d 1164 (5th Cir. 1993). The defendant was charged with two counts of threatening to kill the President. *Id.* at 1166. The first count was based on his statement to an inmate, and the second count was based on his similar statement to a Secret Service agent and warden (collectively "officers") who conceded they had not issued *Miranda* warnings. *Id.* at 1165-66. The court held that even assuming a violation of *Miranda* prior to the latter statement, "nevertheless the evidence of the renewed threat charged in Count Two is not inadmissible due to the lack of *Miranda* warnings, because the threat constituted a new crime rather than evidence of a prior offense." *Id.* at 1167 (citing *Kirk*, *Garcia-Jordan*, and *Mitchell*). The court also held that the officers' behavior did not qualify as an extreme case of outrageous police conduct. *Id.* at 1170. To benefit from that defense, the defendant had to prove that "he was not an active participant in the criminal activity and that the government was overinvolved in the charged crime." *Id.* at 1167-68. The standard is the same as that for outrageous conduct challenges in other contexts. *Id.* at 1168 & n.7.

The court found no outrageous conduct because the defendant was an active participant in his crime. *Id.* at 1169. "[The warden] testified at the suppression hearing that when [the defendant] began to talk, he spoke 'very freely.'" *Id.* Nor was the conduct an

11

abridgment of fundamental fairness protected by due process.  *Id.*  The officers were not

"overinvolved in the charged crime."  *Id.*  The defendant "was afforded the opportunity to

express threats," but he was "not urged, tricked, or baited into doing so"; nor was the

questioning prolonged.  *Id.*  The defendant knew the identities of the agents and their purpose

for questioning them, and the defendant was aware of one officer's role with the Secret

Service and the serious implications of the defendant's statements threatening the President.

*Id.*  Also contributing to the court's conclusion was the following:

> It was not [the Secret Service agent's] intent to elicit a new threat.  As an agent of the governmental agency charged with the President's safety, [the Secret Service agent] was responsible for determining the seriousness of [the defendant's] threat.  Questions to [the defendant] concerning his feelings toward President Bush were therefore proper.  Although it is quite conceivable that these questions could lead, as they did in fact lead, to the renewed threat charged in Count Two, it is also plausible that [the defendant] would attempt to conceal or minimize his hostile attitude or intentions respecting the President.  *We conclude that [the defendant's] criminal response, though perhaps probable, was not predictable with reasonable certainty and that in any event the conduct leading to it was not outrageous.*
>
> . . . .
>
> . . . Although it is true that [the officers] deliberately decided not to give [the defendant] his full *Miranda* warnings, there is no evidence of a bad faith intent to violate [the defendant's] rights.  Whether *Miranda* applied was at least less than obvious.  The agents did not intend to elicit a confession to the [first] threat and, indeed, did not even question [the defendant] concerning his [first] statements . . . .  And, as discussed above, the failure to give *Miranda* warnings does not prevent prosecution of a new crime.  *Mitchell*, 812 F.2d at 1253-1254.
>
> Further, "[t]he prophylactic *Miranda* warnings are 'not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected.'"

*Id.* at 1169-70 (emphasis added) (footnote omitted).  As the Second Circuit noted in *United*

*States v. Awadallah*, 349 F.3d 42 (2d Cir. 2003), "[o]ther circuits have likewise held that the

12

fruit of the poisonous tree doctrine does not apply to new crimes committed by an individual who has been unlawfully detained." *Id.* at 81 n.8 (citing the Seventh Circuit ("giving false social security number to the police"),[9] the Fifth Circuit in *Smith*, the Ninth Circuit in *Mitchell*, the Eleventh Circuit in *Bailey*, and the First Circuit).

These cases dictate the outcome for Mr. Owuor's suppression motion. Even assuming *arguendo*, that *Miranda* warnings should have been given before he answered questions in the interview room, the resulting statements are not evidence of a prior crime, but are themselves a new crime – that of false statements (under either charged offense) – and thus not subject to the exclusionary rule. As were the threatening statements or statements about citizenship, the statements Mr. Owuor gave the Agents in the interview room regarding his citizenship, if proven false, were new crimes.[10]

Complicating this case, however, is the first set of statements that Mr. Owuor gave in the booking room.  Given these statements, were the subsequent statements in the interview room incriminating evidence of a prior crime? Answering this question is not necessary.  Mr. Owuor made statements particular to United States citizenship, as well as

───────────────

[9] In *United States v. Pryor*, 32 F.3d 1192 (7th Cir. 1994), the court noted that the defendant would have lost a motion to suppress for the conviction of using a social security number obtained on the basis of using false information because regardless of whether *Miranda* warnings prefaced his incriminating statements, "[he] did not divulge *evidence* of some prior crime during his few minutes in office; instead, he *committed* a crime, which makes all the difference." *Id.* at 1195.

[10] Both Agents Henderson and Diamond testified that during their discussion with him in the interview room, Mr. Owuor claimed he was a United States citizen. (Hr'g Tr. 44, 71.)  Agent Henderson testified that Mr. Owuor claimed to be a citizen of the United Kingdom and Kenya as well (Hr'g Tr. 44), and Agent Diamond testified that Mr. Owuor claimed again that he was born in Atlanta, and that his mother was a United States citizen (Hr'g Tr. 70).

other material statements, in the interview room.  Those statements thus sufficiently supply

the factual basis for both charges – a false statement as to Mr. Owuor's United States

citizenship, and a § 1001 false statement.[11]

---

[11] If the Government were to use the statements from the interview room to *prove* that Mr. Owuor made a prior false statement in the booking room, the Government's argument against suppression would be on much less sure footing. *Lopez-Garcia* addresses this question and is distinguishable in a way that is informative as to whether warnings are required here if the interview room statements are used to prove a *prior* crime.  In *Lopez-Garcia*, the defendant moved to suppress statements he had made to an ICE agent who interviewed him while in police custody on unrelated drug charges.  2009 WL 1044594, at *1.  The defendant argued that his *Miranda* warnings should have been read to him.  *Id.*  The purpose of that interview, the court describes, "was to determine whether the detainee had the documentation necessary to remain in the United States," and "not to initiate criminal charges against those present in the country illegally." *Id.* at *2.  The court also noted that the agent lacked the authority to bring criminal charges against the individuals he interviewed.  *Id.*  His role instead was to arrange for individuals to appear before immigration judges or to facilitate the removal of those who waived those appearances.  *Id.*  The ICE Agent's "role was to identify illegal aliens and facilitate their removal from the country." *Id.*  He received lists of individuals booked in jail who were not born in the United States, and chose whom to interview based on charges against them and initial checks of their immigration status.  *Id.*

The ICE agent met with the defendant after running a preliminary computer search from which he learned that the defendant had been born outside of the United States.  *Id.* at *1-2.  In uncontradicted testimony, the ICE agent claimed he told him that he was being interviewed "to determine whether he had immigration papers." *Id.*  He did not issue the defendant *Miranda* warnings during this interview.  *Id.*  In response to the questioning, the defendant gave the ICE agent incorrect and incomplete information.  *Id.*  The ICE agent later received more official information on the defendant, and upon that information, interviewed the defendant again, this time, with another ICE agent.  *Id.*  The defendant was read his *Miranda* rights before this interview, and he gave the ICE agents more information.  *Id.*  He was later indicted on federal charges for unlawfully being in the United States after having been removed and deported.  *Id.* at *3.

The court held that *Miranda* warnings were not required before the first interview.  *Id.* at *8.  The only *Miranda* issue was whether the interview was an interrogation.  *Id.* at *7.  The question of interrogation "boil[ed] down to whether [the ICE Agent] should have known that his questions were reasonably likely to elicit an incriminating response from [the defendant]." *Id.*; see also *United States v. Mata-Abundiz*, 717 F.2d 1277, 1279 (9th Cir. 1983) ("If an [Immigration and Naturalization Service] investigator has no reason to suspect that the question asked is likely to elicit an incriminating response, there is no interrogation and, therefore, no *Miranda* violation.").  The court held that the ICE agent should not have known, for two reasons: (1) he "had no reason to believe that [the defendant] would confess to having illegally entered the country"; and (2) he did not have any basis for believing the defendant would be *prosecuted* for the offense.  *Id.* at *7, *8 (emphasis in original).  The court noted, however, that the ICE agent testified that he routinely ran a check before interviewing detainees on their immigration status to make sure that nothing came up that would signal that his interviews would lead to discussions of criminal conduct.  *Id.* at *7.  The court's conclusion was that "*[b]ased on the information available to him*, [the ICE agent] should not have thought it especially likely that [the defendant] would admit to having committed a crime." *Id.* (emphasis added).  The court also found the ICE agent had no basis for believing that the defendant would be prosecuted for the offense.  *Id.* at *8.  The underlying charge that

14

*Smith* forecloses the argument that the Agents' investigative conduct nevertheless violated Mr. Owuor's due process rights. As was the case in *Smith*, there is no evidence here contradicting Mr. Owuor's free participation in the conversation. He knew the Agents' identity, and there is no indication that he was not aware of the obviously serious implications of falsely claiming United States citizenship and falsely giving related

---

triggered his arrest was not immigration-related, and the ICE Agent's questioning "was not initiated for law enforcement purposes." *Id*. "The ICE Agent was simply tasked with facilitating the removal of individuals illegally present in the country; deciding whether to bring criminal charges was, as he put it, 'not his call.'" *Id.*

*Lopez-Garcia* is distinguishable in important ways from this case. The ICE agent in Lopez-Garcia started the interview with no indication that the suspect had or would commit a crime. In this case, the Agents *did* have reason to believe that Mr. Owuor had committed a crime. The Agents knew, based on their criminal history check, that Mr. Owuor *had already possibly lied* to an Agent about his country of birth, and that whatever statements he gave during the interview could confirm that he had given a false statement to federal officers regarding his country of birth. The Agents in this case were therefore armed with knowledge that Mr. Owuor may have already committed a crime.

In *Lopez-Garcia*, the ICE agent was performing routine interviews of selected individuals to determine their immigration status, but the Agents in this case returned to interview Mr. Owuor precisely because his information did not match his statements. Confirming his identity may have been one purpose of the interview, but the Agents nevertheless proceeded with that interview knowing that Mr. Owuor could confirm that he had made a false statement. In other words, by confirming his identity, they were confirming his alleged crime.

Just because the Agent testified that the purpose of the interview was for determining "administrative violations" and was not a "criminal investigation" (Hr'g Tr. 68), that does not relieve this court of its duty to consider the testimony in context. Indeed, Agent Henderson noted that he was responsible not only for enforcing immigration laws, but also for "investigating criminal offenses involving immigration related issues." (Hr'g Tr. 8.) In fact, Agent Diamond stated in his Affidavit attached to the criminal complaint that his "principal assignment has been to conduct criminal investigations of persons involved in violation of the United States Code relating to Title 8 (Aliens and Nationality) and Title 18 (Crimes and Criminal Procedure)." (Diamond Aff. 1 (Criminal Compl. Ex).) The Agents at the very least wore two hats, and the Agents cannot control which hat they were wearing by merely labeling it. *Mata-Abundiz*, 717 F.2d at 1280 ("[T]he investigator cannot control the constitutional question [of interrogation] by placing a 'civil' label on the investigation."). Using the interview room statements therefore to prove the booking room crime may raise independent Fifth Amendment concerns. *See id.* at 1279 (holding that an INS Agent should have given *Miranda* warnings even though he was obtaining biographical information because defendant was jailed on state firearms violations and the agent with his experience knew that evidence of alienage of firearms possession could be a federal crime and any admission would be highly incriminating)

15

information to federal agents charged with ferreting out immigration offenses.  There is no evidence that the Agents tricked or baited Mr. Owuor.  Nor was the questioning prolonged.

The Agents were tasked with investigating criminal offenses, as well as immigration offenses but the evidence does not suggest they intended to elicit a *new* false statement.[12] The Agents had conflicting information about Mr. Owuor's citizenship information.  They never asked him about the prior false statement.  They simply asked him the same information but in more detail.  "Although it is quite conceivable that [their] questions could lead, as they did in fact lead, to the renewed [false statement] charged [in the indictment]," *Smith*, 7 F.3d at 1169, it was also plausible, as the Agents' uncontroverted testimony supports, that Mr. Owuor could have been in the United States legally and *innocent* of any prior false statements.  *See id.*  The facts underlying Mr. Owuor's statements had yet to be confirmed.  In *Smith*, there was no question as to the defendant's prior crime of threatening the President and still the new threat was not suppressed.  *See id.* at 1165.

For the reason that the exclusionary rule would not bar Mr. Owuor's statements in the interview room, and because the Agents' conduct did not otherwise violate due process during their interview with Mr. Owuor, the Recommendation is due to be adopted on this claim.

---

[12] The only concern would be with their eliciting evidence that Mr. Owuor had already given a false statement, a concern addressed in the prior footnote.

## IV.  DUE PROCESS CLAIM

Mr. Owuor also has moved to dismiss the indictment for violating due process rights guaranteed by the Fifth Amendment.  (Def.'s Mot. Dismiss 1.)  Mr. Owuor accuses the Agents of torturing him, breaking his finger, dislocating his shoulder, and tearing his shoulder muscle during an illegal interrogation.  (Def.'s Mot. Dismiss 1.)  The Government denies the factual basis of the claim and argues alternatively that the conduct was not extreme enough to justify a dismissal.  (Gov't.'s Resp. ¶¶ 27 & 28.)  Mr. Owour's objections confine his claims to the incidents in the hallway, during which he argues the injuries occurred.[13] (*See* Def.'s Objections # 1, 6.)  He also argues in a supplemental filing that taking fingerprints requires probable cause or a warrant, and if the defendant resists, the law enforcement officers should obtain a court order.  (Def.'s Supplemental Points & Authority 2.)

The Recommendation to reject the due process claim is due to be adopted.  A *de novo* review of the videotape confirms: There is no evidence of conduct that is so rare and

---

[13] In his motion to suppress, Mr. Owuor argues that the statements in the interview room should be suppressed on the additional ground that they were the product of a coercive interrogation, and because the Agents used physical force against him, in violation of due process.  (Def.'s Mot. Suppress 6-7.)

The appropriate test for determining the voluntariness of a confession under due process, for suppression purposes, is whether, "under the totality of the circumstances, [the confession] is the product of the defendant's free and rational choice."  *Harris v. Dugger*, 874 F.2d 756, 761 (11th Cir. 1989).  A confession "must not be extracted by any sort of threats or violence, or obtained by any direct or implied promises, or by the exertion of any improper influence."  *Id.*

Mr. Owuor did not object to the Recommendation's suppression finding on due process grounds. The objections only address the abuse that allegedly occurred during the hallway incident.  That incident occurred *after* the statements Mr. Owuor gave in the interview room.  As discussed earlier, an independent review of the record confirms that the interrogation in the interview room did not violate due process.

outrageous as to violate "'fundamental fairness, shocking to the universal sense of justice mandated by the due process clause of the fifth amendment.'"  *United States v. Edenfield*, 995 F.2d 197, 200 (11th Cir. 1993) (quoting *United States v. Tobias*, 662 F.2d 381, 386-87 (5th Cir. Unit B 1981)).  "The defense is to be invoked only 'in the rarest and most outrageous of circumstances.'"  *United States v. Ofshe*, 817 F.2d 1508, 1516 (11th Cir. 1987) (quoting *United States v. Haimowitz*, 725 F.2d 1561, 1577 (11th Cir. 1984)).  The videotape, confirming the testimony, shows Mr. Owuor resisting what appears to be the Agents' attempt to obtain fingerprints.  The Agents' testimony, uncontradicted by testimony or videotape, was that he became aggressive.[14]  (*E.g.*, Hr'g Tr. 58-59 (Agent's testimony that Mr. Owuor started "resisting [the Agents] and attempting . . . what seemed like he was about to fight," that he was "fighting the whole time, yelling," and that he "would not comply with instructions to place his hands behind his back"[15]).  The Agents appear to have handled the altercation by putting Mr. Owuor on the floor efficiently, with a clean move.

Mr. Owuor's supplemental argument, that the proper procedure for handling a detainee who refuses to be fingerprinted is a court order and not force, assumes that the Agents applied inappropriate force solely to quell Mr. Owuor's resistance to fingerprinting. For one, it is not apparent, even if that were the case, that such conduct by the Agents would amount to outrageous conduct justifying the dismissal of the Indictment.  Additionally, the

---

[14] Mr. Robinson's testimony regarding Mr. Owuor's shouts of pain does not contradict this finding.

[15] The Agents had uncuffed Mr. Owuor to take his fingerprints.  (Hr'g Tr. 59.)

argument assumes the very conclusions the court must reach on its own assessment of the videotape.  Mr. Owuor did not merely stand and refuse to be fingerprinted.  He moved in resistance to the fingerprint away from the officers and became aggressive toward them.  The interaction does not justify the severe remedy of dismissal.

The fingerprints were also not illegally procured.  In *Davis v. Mississippi*, 394 U.S. 721 (1969), the Supreme Court held that "in the absence of probable cause or a warrant investigative detentions at the police station for fingerprinting purposes could not be squared with the Fourth Amendment."  *Hayes v. Florida*, 470 U.S. 811, 815 (1985) (summarizing *Davis*'s holding though noting that the Court left open the possibility of an exception); *e.g.*, *Mills v. Wainwright*, 415 F.2d 787, 709 (5th Cir. 1969) ("In that the arrest was illegal, it is without question that the fingerprints obtained during the illegal detention were inadmissible, and to allow them into evidence during the trial was reversible error.").  The Court discusses *Davis*, however, in terms of the removal of a suspect from a place where he voluntarily is entitled to be.  *Hayes*, 470 U.S. at 816 ("And our view continues to be that the line is crossed when the police, without probable cause or a warrant, forcibly remove a person *from his home or other place in which he is entitled to be* and transport him to the police station, where he is detained, although briefly, for investigative purposes." (emphasis added)).  The Court also noted that case law supports fingerprinting in the field even if there is only reasonable suspicion of criminal activity.  *Id.* at 816-17; *see United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1223 (11th Cir. 1993) (describing *Hayes* as "endorsing" in the field fingerprinting).

Even assuming Mr. Owuor's argument, however, that the Agents needed a separate justification of probable cause to obtain his fingerprints, that justification was established. "'Probable cause to arrest exists when law enforcement officers have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime.'" *Lopez-Garcia*, 2009 WL 1044594, at *5 (quoting *Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1137 (11th Cir. 2007)). There is ample support in the record for a reasonable belief that Mr. Owuor had made false statements in violation of federal law, so there was probable cause for taking the fingerprints.

Mr. Owuor's supplemental fingerprinting arguments do not justify dismissing the Indictment. Accordingly, the Recommendation is due to be adopted on this claim.

## V.  CONCLUSION

It is ORDERED that:

(1)     Mr. Owuor's objections (Docs. # 48, 54) are OVERRULED;

(2)     The Report and Recommendation of the Magistrate Judge (Doc. # 47) is ADOPTED;

(3)     The motion to suppress (Doc. # 29) is DENIED;

(4)     The motion to dismiss the indictment (Doc. # 30) is DENIED.

DONE this 20th day of May 2009.


_____/s/   W.  Keith  Watkins_____
UNITED STATES DISTRICT JUDGE

20