**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL ACTION NO. |
| v. | ) | 2:08-cr-149-WKW |
| | ) | [wo] |
| PETER MAKUSI OTEMBA OWUOR | ) | |

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Pending before the Court are the Defendant's *Motion to Dismiss Jury Venire* (Doc. 83, filed 6/22/09), *Memorandum in Support of Request for New Trial Based Upon Improperly Constituted Jury . . .* (Doc. 102, filed 7/24/09), and the Government's *Response* (Doc. 103, filed 7/31/09). Defendant Peter Owuor (hereinafter "Owuor" or "Defendant") moved to dismiss his jury venire. After hearing argument from the parties and due consideration of applicable law, the Magistrate Judge recommends that the District Court **DENY** the motion to dismiss the venire (Doc. 83).

### I. FINDINGS OF FACT

On July 29, 2008, the Grand Jury for the Middle District of Alabama indicted Peter Owuor ("Owuor") for (1) falsely and willfully representing himself to be a citizen of the United States, in violation of 18 U.S.C. § 911; and (2) knowingly and willfully making a false, fictitious, and fraudulent statement and representation, in violation of 18 U.S.C. § 1001(a)(2). *See* Doc. 23. On June 22, 2009, the morning of jury selection, Owuor filed a *Motion to Dismiss Jury Venire* (Doc. 83). Attached to the motion was an affidavit by

Attorney Kevin Butler, Owuor's counsel.  Mr. Butler averred that the venire juror profiles, given to him on June 19, 2009, indicated the ethnic makeup of the venire was approximately 14.1 % African-Americans, 79% Caucasians, 3.8 % Asian-Americans, and 2.56 % persons of undetermined race.  Mr. Butler also averred that his research showed African-Americans constitute 36 % of the population in the Northern Division of the Middle District of Alabama. The affidavit concludes with a statement that the under representation of African-Americans in the venire was greater than 10 %,[1] and therefore violates (1) the due process clause of the Fifth Amendment to the United States Constitution; (2) the Sixth Amendment to the United States Constitution; (3) the equal protection clause of the Fifth Amendment; (4) the Jury Selection and Service Act ("the JSSA") (28 U.S.C. §§ 1861 *et seq.*).[2]; and (5) the Middle District of Alabama Plan for the Random Selection of Grand and Petit Jurors.

The JSSA guarantees all federal litigants who are entitled to trial by jury "shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes."  28 U.S.C. § 1861.  The statute then outlines how courts shall achieve such juries.  Briefly, the JSSA prohibits discrimination in jury selection and sets forth the criteria which disqualify one from jury service.  28 U.S.C. §§ 1862, 1865.  It directs federal judicial districts to adopt  plans for

---

[1]Though the affidavit reads "greater than 100 %," this is a typographical error.  As will be discussed *infra*, the Eleventh Circuit's test for under representation in a jury pool is whether there is a difference of 10% or greater between the percentage of the distinctive group in the district's total population, and the same group's representation in the jury pool.

[2]Both parties miscite the JSSA as part of Title 18, rather than Title 28, United States Code.

random jury selection; to send juror qualification forms to persons whose names are drawn from the jury wheel created under the respective plans; and how to select and summon jury panels. 28 U.S.C. §§ 1863-64, 1866. Provisions to challenge compliance with the JSSA are found in section 1867, and the final sections govern records maintenance and definitions. 28 U.S.C. §§ 1868-69. Whether the Middle District of Alabama jury plan complies with the JSSA has been the subject of scrutiny and litigation for several years. In *United States v. Clay*, 159 F.Supp.2d 1357 (M.D. Ala. 2001), the District Court identified practices which violate the JSSA, and accordingly modified the offending practices. *Clay*, 159 F.Supp.2d at 1371.

The post-*Clay* selection process was upheld in *United States v. Carmichael*, 467 F.Supp.2d 1282, 1286-88 (M.D. Ala. 2006), *aff'd*, 560 F.3d 1270, 1275-76 (11th Cir. 2009). A second pair of decisions illuminate the issues raised by Owuor, as the venire at issue here was chosen from the Middle District of Alabama 2005 Master Jury Wheel upheld in *United States v. Siegelman*, No. 2:05cr119-MEF-CSC, 2007 WL 1821289 (M.D. Ala. 2007), *aff'd*, 561 F.3d 1215 (11th Cir. 2009). The current Middle District of Alabama jury plan was approved by the Judicial Council of the United States Eleventh Judicial Circuit on December 17, 2007.[3]

Owuor's motion was referred to the undersigned for resolution in the event he was

---

[3]*See* Plan of the United States District Court Middle District of Alabama For The Random Selection of Grand and Petit Jurors. The plan is accessible through the Court's website (http://www.almd.uscourts.gov/jurorinfo/juror contents.htm).

convicted by the petit jury selected pursuant to the current jury plan.  Owuor was convicted on both counts of the indictment on June 26, 2009.  *See* Doc. 90.  The Court heard argument on the pending motion on August 17, 2009.  During the hearing, the Court gave the parties data it received from the Middle District's Jury Administrator.[4]  The data, used by the Clerk of Court to analyze the District's 2005 jury wheel results, presents United States Census tallies for African-Americans in the entire District, and each of its three divisions.  According to current Census figures, African Americans make up 30.3 % of the District's total population, 30.9 % of the 2005 Master Jury Wheel (MJW), and 22.2 % of the 2005 Qualified Jury Wheel (QJW).

## II.  DISCUSSION AND ANALYSIS

The attorney affidavit supporting the *Motion to Dismiss Jury Venire* alleges a single factual ground for dismissal under the JSSA and Constitution - that African-Americans are "improperly, substantially and illegally under represented by greater than 10 % in the jury venire."

### A. <u>Adequacy of the Affidavit</u>

A JSSA claim requires a party to file a motion and a sworn statement of facts which, if true, would constitute a substantial failure to comply with the JSSA.  28 U.S.C. §1867(d); *United States v. Dean*, 487 F.3d 840, 849 (11th Cir. 2007).  The affidavit in this case alleges the venire tendered to Owuor under represents the African-American

---

[4]The Jury Administrator is an employee of, and supervised by, the Clerk of the United States District Court for the Middle District.  *Carmichael*, 560 F.3d at 1275.

population in the Middle District of Alabama by more than 10%.  Owuor rightly concedes the disparity may be the result of randomness.  Ergo, the Court finds the affidavit does not meet the statutory requirement that it allege facts, which if true, constitute a substantial violation of the JSSA, as the purpose of the JSSA is not to produce a jury of any specific racial composition.  The mere fact that a venire does not reflect the racial makeup of the Middle District of Alabama is not a fact which, if true, constitutes a violation, much less a substantial violation, of the JSSA.

### B.  <u>The JSSA and Sixth Amendment Claims</u>

The fundamental guarantee of the JSSA is "that all litigants in Federal courts entitled to trial by jury shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes."  28 U.S.C. § 1861.  "The JSSA provides remedies for only a 'substantial failure to comply' with its requirements for jury selection procedures that are random, objective, and that produce a jury that is a fair-cross section of the community."  *Siegelman*, 561 F.3d at 1243.  The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . ."  U.S. CONST. amend. VI.  The United States Supreme Court  "has unambiguously declared that the American concept of the jury trial contemplates a jury drawn from a fair cross section of the community.  *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692 (1975).  As "[t]he standard for determining a violation of the statutory fair cross-section requirement is the

same as that applied in assessing a Sixth Amendment fair cross-section violation," this Recommendation will first address the legal grounds for Owuor's JSSA and Sixth Amendment claims. *Carmichael*, 467 F.Supp.2d at 1306, citing *United States v. Rodriguez*, 776 F.2d 1509, 1510 n.1 (11th Cir. 1985).

The Eleventh Circuit recognizes a prima facie case for disproportionate representation when a plaintiff demonstrates "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Carmichael*, *id*. quoting *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664 (1979). *Carmichael* found African-Americans are a distinctive group for purposes of the *Duren* test, thus, the first prong of the test is easily met. *Carmichael* at 1307. The second prong

> requires a comparison between the percentage of the "distinctive group" on the *qualified jury wheel and the percentage of the group among the population eligible for jury service in the division*. *United States v. Pepe*, 747 F.2d 632, 649 (11th Cir. 1984). Although precise mathematical standards are not possible, this circuit has consistently found that a prima facie case of underrepresentation has not been made where the absolute disparity between these percentages does not exceed ten percent.

*Rodriguez*, 776 F.2d at 1511 (emphasis added).

Owuor's claim for relief under the JSSA and Sixth Amendment is thus dependent upon the presence of an absolute disparity of ten percent or more, as the Eleventh Circuit reiterated that "[u]nder black letter Eleventh Circuit precedent, 'i[f] the absolute disparity

between these two percentages is ten percent or less, the second element is not satisfied.'" *Carmichael*, 560 F.3d at 1280.  The absolute disparity rule enumerated in *Carmichael* and applied to Owuor requires that the absolute disparity be measured by subtracting the percentage of African-Americans on the Qualified Jury Wheel from the percentage of jury-eligible African-Americans in the Northern Division.  The data produced by the Jury Administrator shows 25.2 % of the Qualified Wheel was composed of African- Americans, to be subtracted from a Northern Division total of 34.3 %.  The difference of 9.1% does not equal or exceed ten percent.  Hence, Owuor does not meet the second prong of the *Duren* test, which ends the inquiry, as failure on any element of the prima facie case ends a challenge.  *Carmichael*, 467 F.Supp.2d at 1306, citing *Pepe*, 747 F.2d at 649; *see also United States v. Clarke*, 562 F.3d 1158, 1163 (11th Cir. 2009).

Owuor urges the Court to abandon the Eleventh Circuit  absolute disparity test.  He notes the Supreme Court "has never pronounced an immutable threshold disparity that a defendant must show."  Doc. 102, at 8, citing *United States v. Tuttle*, 729 F.2d 1325, 1327 (11th Cir. 1984).  Owuor's criticism of this test argues that it should not be used in this case because "disparity occurs at several different stages of jury selection, due to a variety of practices used . . . and has resulted for years in consistent under representation of African-Americans in the jury venires."  Doc. 102, at 9.  The factual response to this argument is twofold.  First, Owuor does not support his claim with any facts regarding the "variety of practices" which account for the alleged disparity in this case.  Second, the District's relatively recent adjustments to its approved jury plan have remedied past errors, and

consequently, the unnamed practices did not produce the "years [of] consistent under representation" as alleged in the affidavit. The legal response is simpler - this Court is bound by Eleventh Circuit precedent and that Court's especially relevant holding that "black letter law" in this Circuit mandates a disparity of ten percent. *Carmichael*, 560 F.3d at 1280.

Owuor's attempt to evade the black letter law on this issue strikes the Court as an attempt to meet the third prong of the *Duren* test - that the alleged under representation is due to systematic, though perhaps unintentional, exclusion of the group in the jury-selection process. Owuor does not identify any practice which requires a deeper investigation of the jury-selection process in the Middle District of Alabama. As noted by the Eleventh Circuit in *Siegelman*, this District's 2005 wheel was free of the past practices which were harmful to the goals of the JSSA. *Siegelman*, 561 F.3d at 1244. Owuor agreed in the hearing that the venire composition for his trial was not necessarily indicative of a systematic exclusion of African-Americans, but may well have been the result of random selection under the JSSA. *See Carmichael*, 467 F.Supp. at 1296 (observing the JSSA does not define randomness as statistical randomness, and citing legislative history explaining that "[I]t is sufficient for the purpose of this legislation if the plan adopts some system of selection that affords no room for impermissible discrimination against individuals or groups.") Regardless, the data before the Court does not demonstrate the required disparity, and African-Americans are adequately represented in the qualified wheel from which Owuor's venire was drawn.

## C.  The Fifth Amendment Claims

Owuor's motion cites dual Fifth Amendment grounds for dismissal of his venire - the

Due Process Clause and the Equal Protection Clause. In *Carmichael*, the District Court said a due process challenge to jury selection is possible where a claimant shows the "jury selection process tended to exclude or underrepresent some discernible class of persons and consequently to defeat a fair possibility for obtaining a truly representative cross section." *Id*. at 1315, quoting *Untied States v. Maldonado*, 849 F.2d 522, 523 (11th Cir. 1988). Owuor identifies the elements for a due process claim as (1) a jury procedure; (2) which arbitrarily excludes from jury service; (3) a large and identifiable segment of the community. Doc. 102, at 2, citing *Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163 (1972). Further, Owuor argues that because *Peters* does not impose a statistical test or causes for a distinct group's alleged under representation, there is no benchmark for a jury challenge on due process grounds.

*Carmichael*, however, teaches that allegations of systematic exclusion in the jury-selection process are "properly brought under the more precise doctrinal framework of the sixth amendment." The Court agrees that the *Carmichael* approach is far superior to the approach Owuor suggests, which he admits has no analytical benchmark. As in *Carmichael*, this Court finds that Owuor's due process challenge fails because he did not meet the *Duren* test for under representation of a distinct group pursuant to fair cross section standards under the Sixth Amendment.

Owuor proposes a more concrete test for his equal protection claim under the Fifth Amendment. He argues his claim establishes a prima facie case for an equal protection violation because (1) it alleges the excluded group (African-Americans) is distinct and recognizable, and capable of being singled out for discriminatory intent; (2) African-

Americans are substantially under represented; and (3) the District's jury-selection procedure is susceptible to abuse and provides an opportunity for discrimination. *Castenada v. Partida*, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280 (1977). When a prima facie case is established, discrimination is presumed. *Castenada*, *id.* Representativeness of the jury venire is not the focus of an equal protection claim, but rather, "whether members of a discrete group have been intentionally denied the opportunity to serve on a jury." *United States v. Grisham*, 63 F.3d 1074, 1081 (11th Cir. 1995). In *Carmichael*, this Court recognized that proof of intentional discrimination is essential to an equal protection claim. *Carmichael*, 467 F.Supp.2d at 1314, citing *Grisham, id*. Carmichael's equal protection claim was dismissed upon the Court's observation that the record did not demonstrate discriminatory purpose, nor did defendants allege any. *Id*. at 1314-15. The same is true with respect to Owuor, and likewise, his claim warrants dismissal.

### D.  Timing of JSSA Challenges

A jury challenge under the JSSA is governed by the plain text of the statute, which provides

> In criminal cases, before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, *whichever is earlier*, the defendant may move to dismiss the indictment or stay the proceedings against him on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury.

28 U.S.C. § 1867(a) (emphasis added). This provision permits a party to file before the voir dire begins, or within seven days after due diligence would have revealed grounds for a

motion to dismiss or stay proceedings, **whichever is earlier**.  Owuor filed his motion on the day of trial, almost immediately before the voir dire examination.  The JSSA directs that the earlier event governs, therefore, the timeliness of the instant motion is questionable, and requires analysis.  *See Tello v. Dean Witter Reynolds, Inc.* 410 F.3d 1275, 1278-79 (11th Cir. 2005) (discussing a statute of limitations which requires filing of claim within specified time of earlier-occurring event).

The JSSA provides for the maintenance and public inspection of jury-selection records.  Section 1868 states

> [A]fter the master jury wheel is emptied and refilled . . ., and after all persons selected to serve as jurors before the master wheel was emptied have completed such service, all records and papers compiled and maintained by the jury commission or clerk before the master wheel was emptied shall be preserved in the custody of the clerk for four years or for such longer period as may be ordered by a court, and shall be available for public inspection for the purpose of determining the validity of the selection of any jury.

28 U.S.C. § 1868.  Thus, the statute provides that the records and papers relevant to the creation and use of the master jury wheel, including the selection of names for the qualified jury wheel, be available for public inspection.  The Clerk also creates and maintains records which show United States Census figures for racial groups in the District overall and individual divisions.  None of the records contain any personal information and are available to defendants who wish to determine whether the District's jury-selection practices comply with the JSSA.  The venire Owuor challenges came from names selected from the master jury wheel created in 2005.  The records relevant to the wheel are kept by the Clerk for at least four years after "all persons selected to serve as jurors" from that wheel have completed their

service.

The Court finds that if there were any process which would systematically exclude African-Americans from jury service and support a JSSA challenge, Owuor or any other defendant could discern that fact and bring a challenge long before the day of trial.  *See United States v. Bearden*, 659 F.2d 590, 595 (5th Cir. 1981) ("This timeliness requirement was provided to prevent dilatoriness and to endure the rapid disposition of claims, particularly those that are spurious.")  The records and data which could reveal flawed practices in jury-selection, or the under representation of racial groups on the qualified jury wheels, are and were available to Owuor and all other defendants, since the date of indictment.  *See Dean*, 487 F.3d at 849 (placing investigative burden for JSSA claims on defendant, and fixing seven days after indictment as deadline for timely motion under plain text of section 1867).  In fact, it is the opinion of this Court that the only circumstance which would support a date of trial filing would be one where a party learns of some specific action, not sanctioned by the jury plan, which leads, or could lead, to a substantial failure to comply with the JSSA.  The plain text of the statute renders the filing of the instant motion untimely, and practitioners in this District are hereby put on notice that the records relevant to jury selection and service are discoverable before the day of trial.  "Courts are to construe the timeliness requirement strictly, as a failure to comply with the requirement forecloses a challenge under the Act."  *Dean*, *id*., citing *Bearden*, 659 F.2d at 595.  In sum, the failure to file a JSSA claim in compliance with the time limits set out in the JSSA divests the Court of jurisdiction to entertain the claim.

The burden to timely file a JSSA claim is not onerous, as a claim will lie only in three broad categories.  First, if the difference between the census figures of a recognizable group and the Qualified Jury Wheel does not exceed 10% the inquiry ends under *Duren* as set forth *supra*.  A letter, visit, or telephone call to the Jury Administrator will provide counsel with the information to make a determination under the absolute disparity test .

Next, the process to select a venire is a ministerial process which does not vary from term to term.  The Jury Administrator sends out summonses to enough jurors to form a venire for a given trial term.  The number to form a venire varies with the number of cases to be tried during a given term. Once the Jury Administrator determines the number of jurors necessary to form a venire, the Jury Administrator queries a computer database, the Qualified Jury Wheel, to provide the  requisite number of jurors.  The computer randomly generates the names which form the venire.  If  a randomly chosen juror requests an excuse, a Judge rules on the request.  The jurors who remain form the venire.  A simple inquiry to the Jury Administrator will reveal if the venire was chosen by a means other than the specified process.  If the inquiry reveals no substantial variance, the inquiry ends.

Finally, a JSSA claim may lie on the morning of jury selection if counsel were to learn that day that a Jury Administrator or some other Clerk acted or failed to act in a manner which substantially affects the venire.  For example, if the Jury Administrator or a Clerk independently chose to excuse every third juror from the venire, this overt act might destroy the randomness inherent in the approved jury plan, and could merit relief under the JSSA.

The burden to timely file a claim must rest squarely upon the litigants as a matter of

law and policy.  The legal requirements for timeliness are explicit in the JSSA, have been strengthened through Circuit precedent in *Bearden* and *Dean*, and warrant no further discussion.  Strong policy reasons undergird the need for strict compliance with the timeliness requirements of the JSSA.  First, the remedy for a substantial violation of the JSSA is to set aside the verdict - a drastic measure.  While Owuor is a defendant in a criminal case, a JSSA claim may arise and be filed by any party in civil or criminal litigation.  Any party who secures a verdict has a real and vested interest in upholding the verdict on the merits.  Finally, to hold otherwise invites wily counsel to lie in wait and use the JSSA as a strategic tool to resurrect a lost case and perhaps gain leverage a party might not otherwise have, such as the expense and time of another trial; the opportunity to observe trial strategy of the opponent; and gain other tactical advantages too numerous to list.  The Court does not believe or infer counsel for Owuor lay in wait to file a JSSA claim the morning of trial.  As a matter of policy and law,  the Court will not countenance untimely JSSA claims such as the one at bar.

### III.  CONCLUSION

Pursuant to the foregoing findings and conclusions, it is the **RECOMMENDATION** of the Magistrate Judge that Defendant's *Motion to Dismiss Venire* (Doc. 83) be **DENIED**.

It is further **ORDERED** that the parties shall file any objections to the said Recommendation not later than **September 15, 2009.**  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting.  Frivolous, conclusive or general objections will not be considered by the District

Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); *see Stein v. Reynolds Securities, Inc*., 667 F.2d 33 (11th Cir. 1982); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

DONE this 2nd day of September, 2009.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES MAGISTRATE JUDGE